IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

JUSTIN P. RAMZY and ALICIA Y.          *
SPEARMAN,
                                       *
      Plaintiffs,
                                       *
vs.
                                       *
COLUMBUS CONSOLIDATED                          CASE NO. 4:15-CV-2 (CDL)
GOVERNMENT, MUSCOGEE COUNTY             *
SHERIFF'S OFFICE, and JOHN
DARR, *individually and in his*         *
*official capacity*,
                                       *
      Defendants.
                                       *
_____

O R D E R

    Plaintiffs worked at the Muscogee County jail and prison medical clinics. They claim that they were discriminated against because they are black and that they were retaliated against because they complained about racial discrimination and inmate conditions in the clinics. They brought the present action against their alleged employers, the Columbus Consolidated Government ("CCG") and Muscogee County Sheriff John Darr.[1]  They assert their race-based discrimination and retaliation claims pursuant to 42 U.S.C. §§ 1981 and 1983

---

[1] Plaintiffs assert claims against Darr in his official and individual capacities.  Plaintiffs' claims against the "Muscogee County Sheriff's Office" shall be treated as claims against Sheriff Darr in his official capacity. *See Robinson v. Hogansville Police Dep't*, 159 F. App'x 137, 138 (11th Cir. 2005) (per curiam) ("Sheriff's departments and police departments are not usually considered legal entities subject to suit.").

(Fourteenth Amendment Equal Protection) and Title VII, of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.* They assert their speech-based retaliation claims pursuant to § 1983 (First Amendment). The Court previously dismissed Plaintiffs' Title VII claims because they were untimely. *Ramzy v. Columbus Consol. Gov't*, No. 4:15-CV-2 (CDL), 2015 WL 5838484, at *2 (M.D. Ga. Oct. 5, 2015). Defendants now seek summary judgment on Plaintiffs' remaining claims. As discussed in this Order, Defendants' motions (ECF Nos. 37 & 47) are granted.

## I. Plaintiffs' Claims

It is not entirely clear who employed Plaintiffs for purposes of the pending motions—Sheriff Darr, CCG, or both. The Muscogee County Sheriff's office operated the medical clinics at the Muscogee County jail and the Muscogee County prison until both clinics were privatized in 2013. During the timeframe relevant to this action, Defendant John Darr was the Muscogee County Sheriff; he was the top of the chain of command for the jail, and he had the final say over hiring, promotion, and termination decisions regarding jail employees. The Muscogee County prison is separate from the jail and is under the CCG mayor's chain of command, although Darr testified that the medical clinic staff at the prison was still the Sheriff's responsibility. Darr Dep. 140:22-141:5, ECF No. 44.

Defendants preliminarily contend that to the extent Plaintiffs were employees of Sheriff Darr, their official capacity claims against Darr must be dismissed under the Eleventh Amendment to the United States Constitution because Darr was acting as an arm of the state when he made the decisions complained of in this action and is thus entitled to immunity. CCG argues that Darr was not a final policymaker for CCG, and therefore, CCG cannot be held legally responsible for any of his decisions or conduct. As explained in the remainder of this Order, Plaintiffs' claims fail for more fundamental, easier to decide, issues—issues that the Court must examine to decide the claims against Darr in his individual capacity. Thus, the Court does not need to decide the Eleventh Amendment and municipal liability issues.

Plaintiff Justin P. Ramzy is a black man who worked as a medical technician in the Muscogee County jail clinic. Ramzy claims that B.T., a white female who became health service administrator on February 29, 2012, gave him more difficult work assignments than she gave white employees.[2] Ramzy also claims that his suspension and termination, which Defendants maintain were justified due to his practice of prefilling and

---

[2] The Court finds it unnecessary to refer to certain non-parties by their full names. Therefore, throughout this order, several individuals are identified using only their initials.

photocopying   inmate   intake   forms,   were   discriminatory   and retaliatory.

Plaintiff Alicia Y. Spearman is a black woman who worked as a licensed practical nurse in the Muscogee County jail and prison medical clinics.   When she was hired in the jail clinic on January 3, 2008, her mother was the jail clinic's director of nursing, and her sister also worked at the jail clinic.   These family connections prompted other jail clinic employees to complain of nepotism.   C.B. June 2, 2016 Dep 65:4-66:15, 73:14-18, ECF No. 46.   Before the events giving rise to this action, Spearman was transferred from the jail clinic to the prison clinic.   During the timeframe relevant to this action, Spearman worked primarily at the prison clinic, although she sometimes worked overtime at the jail clinic.

Spearman claims that (1) she was denied an opportunity to apply for three open positions because of her race and in retaliation for her protected activity, (2) she was denied proper compensation because of her race, (3) she was subjected to internal investigations and counseling in retaliation for her protected activity, and (4) she was terminated because of her race and in retaliation for her protected activity.

Both Ramzy and Spearman claim that they were subjected to a racially hostile work environment based on the following:

- Their supervisor, B.T., was friendlier to white employees than to black employees; took breaks and socialized with white employees but not black employees; and discussed clinic operations with white employees but not black employees.

- B.T. commented, on one occasion, that G.R., a black employee could learn to pass medications because B.T. could teach a monkey how to do it.

- When the clinic was short staffed, B.T. required employees to work double shifts. On one occasion, she "asked" a white employee to stay over but "told" several black employees to stay over.

- On one occasion, B.T. treated a black employee differently than she treated a white employee with regard to funeral leave requests.

- B.T. once bought white employees pizza when they stayed late to help cover another shift, but she did not buy pizza for black employees who did the same thing.

- Under B.T.'s leadership, black employees started arguing with white employees about changes to the clinic.

- A white nurse commented once that a monkey could do a vital signs check.

- A white nurse stated that she did not like the celebration of Black History Month.

- Clinic manager R.B. told three medical records technicians that he wished they could go "back to the days when we shackled you to get the work done." Spearman Aug. 25, 2016 Dep at 126:5-14. R.B. was promptly suspended.

As explained in the remainder of this Order, some of Plaintiffs' claims were brought too late and are barred by the statute of limitations; some fail because Plaintiffs cannot establish a prima facie case of discrimination or retaliation; and others fail because Defendants articulated a legitimate,

non-discriminatory/non-retaliatory reason for their decisions and Plaintiffs did not produce sufficient evidence to create a genuine factual dispute as to whether Defendants' reasons were a pretext for discrimination or retaliation. Finally, Plaintiffs' hostile work environment claims fail because Plaintiffs did not present enough evidence to create a genuine factual dispute as to whether the alleged harassment was sufficiently severe or pervasive to alter the terms and conditions of their employment.

## II.  Claims Brought Too Late

The Court previously dismissed Plaintiffs' Title VII claims as untimely. *Ramzy*, 2015 WL 5838484, at *2. The Court also dismissed as untimely Plaintiffs' § 1983 Equal Protection and First Amendment claims based on adverse employment actions that occurred before January 5, 2013. *Id.* at *3. *See McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008) ("All constitutional claims brought under § 1983 are tort actions, subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought."); O.C.G.A. § 9-3-33 (establishing a two-year statute of limitations for personal injury claims in Georgia). These claims include (1) Justin Ramzy's Equal Protection claim that he was, because of his race, given difficult work assignments in 2012; (2) Alicia Spearman's Equal Protection and First Amendment claims that she was, because of her race and protected activity,

not given a promotion to health service administrator in 2012;
and (3) Spearman's Equal Protection and First Amendment claims
that she was, because of her race and protected activity, not
given a promotion to clinic manager in 2012.

Spearman's § 1981 discrimination claim based on her
allegation that she was denied an opportunity to apply for the
health service administrator position in 2012 is also subject to
a two-year statute of limitations and is time-barred. The
health service administrator was employed by Corizon, Inc., an
independent agency, not the Sheriff or CCG. Therefore,
Spearman's claim is that she was prevented from making an
employment contract with Corizon because of her race. This type
of claim was actionable under the pre-1991 version of § 1981.
*Patterson v. McLean Credit Union*, 491 U.S. 164, 185 (1989)
(superseded by the Civil Rights Act of 1991, Pub. L. No. 102–166
§ 101, 105 Stat 1071). Thus, it is subject to a two-year
statute of limitations, not the four-year statute of limitations
that applies to § 1981 claims made possible by the Civil Rights
Act of 1991. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369,
382 (2004) (noting that the Supreme Court's construction of
28 U.S.C. § 1658 "leaves in place the 'borrowed' limitations
periods for pre-existing causes of action"). The claim accrued
in February 2012 when Spearman learned that a white woman had
been selected for the position. She waited more than two years

7

to file this action.  Accordingly, that claim is barred by the statute of limitations.

## III. Claims Lacking Evidence to Establish a Prima Facie Case

Plaintiffs rely on circumstantial evidence to support claims of discrimination and retaliation; thus, they must create an inference that the employer's conduct was motivated by an improper discriminatory or retaliatory motive.  This is done by presenting evidence to establish a prima facie case.  To establish a prima facie case for a discrimination claim, an employee must point to evidence that creates a genuine factual dispute on the following elements to avoid summary judgment: (1) she is a member of a protected class, (2) she was qualified to do the job, (3) her employer subjected her to an adverse employment action, and (4) her employer treated similarly situated individuals outside of her protected class more favorably. *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1192 (11th Cir. 2016) (explaining the standards in the context of a Title VII case); *accord Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009) (Discrimination claims "brought under the Equal Protection Clause, 42 U.S.C. § 1981, or Title VII . . . are subject to the same standards of proof and employ the same analytical framework").  To create a prima facie case of race-based retaliation, an employee must show that "(1) he engaged in a statutorily protected activity; (2) he suffered an

adverse employment action; and (3) he established a causal link between the protected activity and the adverse action." *Id.* at 1307-08.   To state a claim for First Amendment retaliation, the employee must demonstrate that "(1) he engaged in protected speech; (2) the defendant's conduct adversely affected the protected speech; and (3) a causal connection exists between the speech and the defendant's retaliatory actions." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016).

The Court finds that several of Plaintiffs' claims fail because Plaintiffs did not point to sufficient evidence to establish a prima facie case.   The Court describes each of Plaintiffs' deficient claims in turn.

A.   Ramzy

Work Assignments.   Ramzy contends that his supervisor, B.T., discriminated and retaliated against him by assigning him more work than she assigned to white employees.   The only evidence Ramzy pointed to on his work assignment claims is evidence that he was assigned the most difficult medicine cart on his shift three times and was assigned to distribute medicine to female inmates twice during 2012.[3]   As discussed *supra* § II, any Equal Protection and First Amendment claims based on 2012 conduct are time-barred.   Only Ramzy's § 1981 claims remain.

---

[3] To the extent that Ramzy is asserting a disparate work assignment claim based on other assignments, he did not point to what they were or how they differed from assignments to individuals outside his protected class.

Ramzy did not point to any evidence that Darr knew about or was involved in these assignments. His work assignment claims fail for this reason. *See Bryant*, 575 F.3d at 1299 ("It is well established that liability in § 1983 cases cannot be premised solely upon a theory of respondeat superior."). Ramzy also did not point to any evidence that these assignments constituted a serious and material change in the terms, conditions, or privileges of his employment or that they would have dissuaded a reasonable employee from engaging in activities protected under § 1981. Moreover, as to his retaliation claim, he did not produce evidence that he engaged in protected activity that a decisionmaker knew about before he received the assignments, and thus he produced no evidence to support the causation prong of the prima facie case. Therefore, to the extent Ramzy attempts to base his claims on his work assignments, he failed to establish a prima facie case of discrimination or retaliation.

Suspension and Termination. Ramzy claims that he was suspended and later fired because of his race and protected activity. Defendants maintain that he was suspended and terminated because his supervisor discovered that he had a practice of prefilling and photocopying inmate intake forms and because of his previous disciplinary record. Although the Court finds for purposes of summary judgment that Ramzy made out a prima facie case for his retaliation claims arising from his

10

suspension and termination, the Court concludes that he did not make out a prima facie case that his suspension and termination were racially discriminatory.

Ramzy's supervisor, B.T., discovered Ramzy's practice of using intake forms with prefilled vital sign information sometime in the fall of 2012. On October 22, 2012, B.T. placed Ramzy on administrative leave pending an internal investigation of his alleged falsification of inmate medical records. Ramzy was terminated in March 2013.

Ramzy does not dispute that he prefilled vital sign information on the jail medical screening forms, photocopied them, and used them when he conducted medical screenings on inmates. *See* Ramzy May 26, 2016 Dep. Ex. 12, Letter from Justin Ramzy to Capt. Schaffer *et al.* 1 (Oct. 22, 2013), ECF No. 62-12 ("Oct. 22 Letter"). Ramzy does not know of any other employees who used forms with prefilled vital sign information. No one taught Ramzy to use prefilled forms; it was his own idea.

Ramzy admits that he prefilled a respiration rate of 18, temperature of 98.6, pulse oximeter of 100%, and fasting blood sugar N/A. He also admits that he prefilled "within normal limits" for the following assessments: general appearance, behavior, state of consciousness, ease of movement, breathing, and skin. And Ramzy admits that he used the prefilled vital signs for the majority of inmates he assessed, although he

asserts that he only used the prefilled form if the inmate appeared to be asymptomatic, did not complain of symptoms, and appeared to him to be within normal limits for each assessment.

Ramzy did not alter the prefilled respiration rate of 18 if the inmate appeared to be breathing normally and he estimated that the inmate's respiration rate was within normal limits. *E.g.,* Ramzy May 26, 2016 Dep. 176:16-24. Ramzy did not alter the prefilled temperature of 98.6 degrees if the inmate had a temperature below 98.6 and appeared to be within normal limits. *Id.* at 188:10-189:11. Ramzy also did not alter the prefilled temperature of 98.6 degrees if the clinic's equipment showed an unusually low body temperature of 94 or 95 degrees and the inmate appeared to be within normal limits; in such cases, Ramzy assumed that the equipment had malfunctioned and that the inmate had a temperature of 98.6 degrees. *Id.* at 228:5-17. If an inmate did not report having chronic obstructive pulmonary disease or a history of breathing difficulties and the inmate's pulse oximeter reading measured between 96% and 100% oxygen saturation, Ramzy did not alter the prefilled pulse oximeter value of 100%. Oct. 22 Letter 1. If the pulse oximeter machine was not working, Ramzy did not alter the prefilled pulse oximeter value of 100% if the patient appeared to be within normal limits. Ramzy May 26, 2016 Dep. 183:9-24; *id.* at 215:7-10 ("I'd try the machinery, if it didn't work, I'd put down -- I

had -- I had my pre -- -- pre -- prephotocopied forms to say they were within normal limits, you know, and move on.").

Sheila Haden, an investigator with the sheriff's office of professional standards, conducted an investigation into Ramzy's prefilled forms. During the investigation, Ramzy admitted that he used prefilled, photocopied medical intake forms. *Id.* at 265:1-19. According to Ramzy, during Haden's initial investigation, Haden told Ramzy that using prefilled intake forms "seems to be a common practice." *Id.* at 281:6-15. But Darr told Haden that using forms prefilled with vital sign information was *not* a common practice, and Haden conducted a supplemental investigation. In her supplemental investigation, Haden concluded that two medical staff members other than Ramzy "sporadically" used prefilled forms but that it "was not a 'common practice' as had been suggested." Forbus Aff. Ex. 3, IA 12-010 Supplement 1 (Dec. 10, 2012), ECF No. 37-6 at 9. Medical technicians G.R. and A.T. admitted that they used photocopied forms with the signature and date prefilled. *Id.*, ECF No. 37-6 at 9-10. Haden found that Ramzy "was the only member of the nursing staff who regularly used photocopied medical forms that had been prefilled with medical vital sign information" and that "he used them on a daily basis." *Id.*, ECF No. 37-6 at 10. And Haden concluded that the "prefilled signature and dates on

intake forms was the more 'common practice' of those interviewed, not vital sign documenting." *Id.*

As a result of Haden's investigation, G.R., a black woman, and A.T., a white man, received written reprimands for using pre-signed and pre-dated intake forms. Ramzy was suspended, pending permanent dismissal, for using intake forms with prefilled vital sign information. Ramzy met with Darr to discuss the situation. During the March 4, 2013 meeting, Ramzy attempted to compare his situation to K.R., a white nurse who was accused of having inappropriate relations with an inmate at the Muscogee County prison.

Based on Haden's investigation, Darr believed that Ramzy used the prefilled intake forms without actually assessing the inmates' vital signs. Darr Dep. 125:20-126:8, 128:16-129:5, 166:22-167:9, 168:13-15. And, Ramzy admits that he had several prior disciplinary issues, including two suspensions for insubordination and a recent suspension for failure to perform his suicide watch duties. By letter dated March 13, 2013, Darr terminated Ramzy's employment, effective March 6, 2013, for falsifying inmate information on medical intake forms and due to his disciplinary history. Ramzy May 26, 2016 Dep. Ex. 16, Letter from John Darr to Justin Ramzy (Mar. 13, 2013), ECF No. 62-16. Darr stated that Ramzy had not provided him with "any information to indicate termination was not appropriate." *Id.*

14

The letter stated that Ramzy could appeal the termination by contacting Captain Larry Tew or by going directly to CCG's human resources department.  Ramzy did not point to evidence that he appealed.

As to Ramzy's prima facie case, there is no dispute that Ramzy was a member of a protected class, was qualified to be a medical technician, and was subjected to an adverse employment action when he was suspended and terminated.  But Ramzy did not produce evidence that he was treated differently from a similarly situated comparator or that there is any other evidence to suggest that his suspension and termination were motivated by his race.

In disparate discipline cases, the key question is whether the plaintiff and his comparators are "similarly situated," meaning that they were "involved in or accused of the same or similar conduct and [were] disciplined in different ways." *Burke-Fowler v. Orange Cty.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).  The "quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  *Id.* (quoting *Maniccia*, 171 F.3d at 1368).

Here, Ramzy, a medical technician, admitted that he used prefilled medical intake forms and that he did not change the

15

prefilled values even if he was not able to get a reading from the clinic's machines.[4]    Ramzy contends that three white employees "committed falsehoods and engaged in deceit" but were not terminated.  Pls.' Resp. to CCG's Mot. for Summ. J. 5, ECF No. 56.  Ramzy points to K.R., a white female nurse who was accused of an inappropriate relationship with a prison inmate. Ramzy contends that K.R. lied during the investigation of the incident because she denied the allegations.  Darr concluded that the investigation was inconclusive as to whether K.R. engaged in the inappropriate activity or lied during the investigation.  And Ramzy did not point to evidence that K.R. had any prior disciplinary history.  For these reasons, K.R. is not similarly situated to Ramzy and is not a valid comparator.

Ramzy asserts that R.B., a white male clinic manager, failed to retain employee time cards for the required amount of time.  Ramzy did not point to any evidence of what the investigation revealed, whether R.B. intentionally destroyed the time cards before he should have, or whether R.B. lied during the investigation.  And Ramzy did not point to evidence that R.B. had any prior disciplinary history.  Therefore, R.B. is not similarly situated to Ramzy and is not a valid comparator.

---

[4] Ramzy argues that there was a common practice of using prefilled screening forms.  Although it is undisputed that two other employees, including a white man, were disciplined for using pre-signed and pre-dated intake forms, Ramzy did not point to any evidence that any other employee prefilled the vital sign information as he did.

Finally, Ramzy asserts that P.Mo., a white male health service administrator, certified that clinic psychiatrists were on-site at the clinics even though they were off-site and on call for part of the time. As a result of the investigation, P.Mo. was suspended for five days. Ramzy did not point to evidence of anything else regarding the investigation that would permit the Court to understand precisely what P.Mo. did, why he did it, or what Darr concluded. Ramzy also did not point to evidence that P.Mo. had any prior disciplinary history. For these reasons, P.Mo. is not similarly situated to Ramzy and is not a valid comparator.

Without a valid comparator, evidence that he did not engage in the misconduct for which he was disciplined, or other evidence to suggest that his suspension and termination were motivated by his race, Ramzy cannot establish that his suspension and termination were discriminatory. Defendants are therefore entitled to summary judgment on Ramzy's discrimination claims based on his October 5, 2017 suspension and termination.[5]

B. <u>Spearman</u>

Defendants are entitled to summary judgment on the following claims asserted by Spearman because she failed to

---

[5] Ramzy's retaliation claim arising from his suspension and termination, for which the Court has found a prima facie case, is dismissed for other reasons as discussed *infra* § IV.A.

point to sufficient evidence to create a genuine factual dispute on the elements of her prima facie case for these claims.

    March 2012 Internal Investigation.   Spearman claims that she was subjected to an internal investigation in retaliation for complaining about discrimination and conditions at the prison.  In March 2012, B.T. complained that one of the nurses had told her that a clinic employee used a prison clinic computer to access personal information about her.   During an internal investigation, Spearman admitted that she had used a prison clinic computer to check B.T.'s nursing license information via the Georgia and Alabama board of nursing websites.   No disciplinary action was taken against Spearman as a result of the investigation.

    As discussed above, any § 1983 First Amendment retaliation claims based on this 2012 investigation are time-barred.   And Spearman's § 1981 retaliation claim fails because she did not point to any evidence that Darr was involved in or knew about the investigation.   Spearman cannot proceed against Darr or CCG solely based on respondeat superior, and these claims thus fail. Moreover, Spearman did not point to any evidence that she engaged in protected activity that B.T. knew about before B.T. initiated the investigation, which means that Spearman did not establish a causal connection to support her retaliation claims based on the March 2012 internal investigation.   Even if she

had, Spearman did not establish that merely being subjected to
an internal investigation under the circumstances here would
have dissuaded a reasonable worker from engaging in activities
protected under § 1981. For all of these reasons, Defendants
are entitled to summary judgment on Spearman's retaliation
claims based on the March 2012 internal investigation.

Fall 2012 Counseling and Investigation. Spearman also
claims that she was unlawfully retaliated against when she was
verbally counseled on one occasion and when she was questioned
on another occasion about inmate care. In October 2012, B.T.
verbally counseled Spearman for placing a sticky note on another
employee's timecard. Spearman does not dispute that she placed
a sticky note on another employee's timecard. Spearman did not
face any formal discipline as a result of the incident. In
November 2012, B.T. questioned Spearman on why she had not
gotten insulin to a diabetic patient. Once Spearman and a guard
explained that several security guards prevented Spearman from
reaching the patient, the investigation was dropped.

As discussed above, any § 1983 First Amendment retaliation
claims based on these 2012 employment actions are time-barred.
And, even if Spearman engaged in protected activity prior to
these two incidents, she did not point to any evidence that Darr
was involved in or knew about either incident. Spearman cannot
proceed against Darr or CCG solely based on respondeat superior,

and this claim thus fails.   Moreover, Spearman did not point to any evidence that she engaged in protected activity that B.T. knew about within the two or three months before B.T. counseled her and investigated the diabetic patient incident, which means that Spearman did not establish a causal connection to support her retaliation claims based on these two incidents.   Even if she had, Spearman did not establish that verbal counseling under the circumstances here or an investigation into the diabetic patient incident would have dissuaded a reasonable worker from engaging in activities protected under § 1981.   For all of these reasons, Defendants are entitled to summary judgment on Spearman's retaliation claims based on the October 2012 verbal counseling and the November 2012 diabetic patient investigation.

    <u>Discriminatory compensation.</u>   Spearman also claims that she was denied proper compensation because of her race.   This claim fails because she did not establish a prima facie case.   "[T]o establish a *prima facie* case of intentional compensation discrimination based on race, the plaintiff must establish that: (1) [s]he belongs to a racial minority; (2) received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) [s]he was qualified to receive the higher wage." *Lee v. Mid-State Land & Timber Co.*, 285 F. App'x 601, 606 (11th Cir. 2008) (per curiam).   It is undisputed that Spearman belongs to a racial minority, but

Spearman did not point to any evidence to support the other elements of a compensation discrimination claim. She did not even point to any evidence on what compensation she was denied. Defendants are entitled to summary judgment on her compensation discrimination claim.

Termination. Spearman also failed to establish prima facie cases for her discrimination and retaliation claims arising from her termination. Spearman was terminated when the clinics were privatized in 2013. From 2009 to 2013, the sheriff's office exceeded its budget. An audit revealed an overage for jail clinic wages and salaries, largely due to overtime pay. Darr believed that privatizing the clinic would fix the overtime pay issues, and he proposed privatizing jail clinic services. It is not clear from the present record when Darr first began contemplating privatization, but Spearman understood that he had made remarks about privatizing the clinic by April 2012.

Darr did not select the vendors for the jail and prison clinics. Rather, committees composed of CCG employees and sheriff's office employees made the decision, with input from CCG's human resources department. Darr met with clinic staff in mid-February 2013 to inform them that the clinics would be privatized later in the year. As part of the privatization process, all clinic medical staff members were terminated from their positions in September 2013. All clinic medical staff

members were advised that they needed to apply for a clinic job through the new vendors and were not guaranteed employment with the new vendors.   Spearman did not apply for a job with the vendors.

Spearman appears to assert that she was terminated because of her race, although the undisputed evidence establishes that every clinic medical staff member was terminated as part of the privatization.   Spearman points out that P.Ma., a white woman, remained clinic manager as a CCG employee after the clinics were privatized.   But Spearman did not present any evidence that she was similarly situated to P.Ma.   Spearman does not dispute that the clinic manager was not considered part of clinic medical staff.   She does not dispute that the clinic manager was responsible for human resources functions, not medical duties. And Spearman, a licensed practical nurse, does not dispute that all other nurses were terminated when the clinics were privatized.   For these reasons, the Court finds that Spearman failed to point to any valid comparator who was not terminated or to any other evidence that her termination was discriminatory or retaliatory.   Accordingly, she did not make out a prima facie case, and Defendants are entitled to summary judgment on Spearman's discrimination and retaliation claims arising from her termination.

To the extent that Spearman contends that Darr privatized
the clinics to retaliate against her because he thought she was
"[c]lose to revealing money fraud" sometime in 2013, Spearman
Aug. 29, 2016 Dep. 163:19-24, ECF No. 41, the Court observes
that Spearman does not assert that she actually did reveal fraud
in the clinics—which might amount to First Amendment protected
activity.   She simply asserts that she was "close to revealing
it."   Spearman also did not point to any evidence that Darr's
decision to recommend privatization of the clinic was related to
anything that Spearman did.[6]   This claim fails.

Spearman further complains that Darr should have helped her
find another job after she was terminated and that he refused to
do so to retaliate against her.   But Spearman did not point to
any evidence that she asked Darr for help finding a new job.   It
is undisputed that Spearman did not apply for a job with the new
clinic vendors, and she did not point to any evidence that Darr
did anything to keep her from applying.

Spearman suggests that Darr "could have given [her] that
job [Darr] convinced CCG to give to his wife" at some
undisclosed time.   *Id.* at 164:19-22.   Or she "could have got
[sic] the job [Darr's] daughter got with the Sheriff Department"
at some undisclosed time.   *Id.* at 165:2-6.   Spearman did not

---

[6] It is undisputed that Darr contemplated recommending privatization of
the clinics for at least a year and that he told employees about the
decision in mid-February 2013, well before the EEOC received
Spearman's EEOC charge on February 28, 2013.

point to evidence of (1) what either position was, (2) whether Spearman was qualified for either position, (3) whether the positions were available in 2013, or (4) whether Spearman expressed an interest in either position.  For all of these reasons, Spearman has failed to establish a retaliation claim arising from Darr's failure to help her find a job after she was terminated.

## IV.  Claims Unsupported by Evidence of Pretext

Although Plaintiffs pointed to sufficient evidence to create a prima facie case as to some of their claims, these surviving claims ultimately fail because Plaintiffs did not produce sufficient evidence to show that Defendants' proffered reasons for the employment actions were pretext for discrimination or retaliation.  Failure to produce such evidence requires summary judgment in favor of Defendants.  *See Trask*, 822 F.3d at 1191 (noting that if an employer proffers legitimate nondiscriminatory reasons for its decision, then the plaintiff must "produce evidence that the employer's proffered reasons are a pretext for discrimination").

### A.  Ramzy

For purposes of the pending motions, the Court finds that Ramzy established a prima facie case of § 1981 retaliation with regard to his October 2012 suspension and his subsequent termination.  But the record also establishes that Darr offered

a legitimate, non-retaliatory reason for his decision to terminate Ramzy: Ramzy admitted to using medical intake forms with prefilled vital signs information, and he had several prior disciplinary issues, including a recent suspension for failure to perform his suicide watch duties. Ramzy did not present sufficient evidence to establish that this proffered reason is a pretext to mask retaliatory intent. Ramzy argues that he did not commit the violation for which he was suspended and fired and that this is evidence of retaliatory intent and pretext. He contends that even though he used prefilled intake forms, he did assess all of the inmates. "The law is clear that, even if a [plaintiff] did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation." *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989). But Ramzy admits that he did not change the prefilled temperature value or the prefilled pulse oximeter value, even if he was not able to get a reading from the clinic's machines. From this, it was certainly not unreasonable for Darr to conclude that Ramzy did not conduct complete assessments on all of the inmates for whom he used prefilled intake forms.

Ramzy also argues that K.R., R.B., and P.Mo., who did not participate in protected activity, engaged in similar misconduct

but were disciplined differently.  As the Court previously explained, K.R., R.B., and P.Mo. were not similarly situated to Ramzy, so evidence regarding them does not establish pretext. *See supra* § III.A.  Given Ramzy's failure to produce evidence of pretext, Defendants are entitled to summary judgment on Ramzy's retaliation claims arising from his October 2012 suspension and subsequent termination.[7]

    B.  Spearman

    For purposes of summary judgment, the Court finds that Spearman made out a prima facie case for the following claims: First Amendment retaliation claim arising from the decision not to appoint her health service administrator in 2012, discrimination and retaliation claims arising from the denial of an opportunity to apply for clinic manager position, and discrimination and retaliation claims arising from the denial of an opportunity to apply for health service administrator position in 2013.  The Court further finds that Defendants articulated non-discriminatory/non-retaliatory reasons for their decisions and that Spearman failed to produce sufficient evidence that those reasons were pretext for discrimination or retaliation.  Accordingly, Defendants are entitled to summary judgment on these claims.

---

[7] The Court observes that while it found that Ramzy's *discrimination* claim arising from his suspension and firing fails because Ramzy failed to establish a prima facie case, *see supra* § III.A, that claim also fails because of Ramzy's failure to show pretext.

2012 Health Service Administrator Decision.  In late 2011, the health service administrator, who had been in that position since the 1990s, vacated the position.  The health service administrator oversaw the clinics at both the jail and the prison and was responsible for supervising the medical directors, doctors, and nurses.  Corizon, Inc., an independent agency, was tasked with filling the vacant position because the new health service administrator would be an employee of Corizon.  Corizon filled the health services administrator role with one of its existing employees, B.T., a white female registered nurse.  She started work at the clinics on February 29, 2012.  According to R.B., the jail's clinic manager at the time, B.T. was understood to bring "many years as a [director of nursing] and [health service administrator] in half a dozen correction sites."  Haden Dep. Ex. 11, Email from R.B. to Tom Barron (Apr. 5, 2012), ECF No. 47-10 at 172.

Spearman does not dispute that she did not apply for the health service administrator position.  But she complains that the position was never posted; if it had been posted, she would have applied for it.  Spearman Aug. 25, 2016 Dep 47:1-12, ECF No. 61.

Based on the present record, it is not clear what role Darr played in the 2012 health service administrator decision.  It is undisputed that Corizon, not Darr, made the decision to hire

B.T. and that B.T. was employed by Corizon, not Darr.   Spearman appears to argue that Darr should have recommended Spearman for the position over Corizon's existing employees.   Spearman did not point to any evidence that she engaged in activity protected under § 1981 before Darr made the decision.   Spearman did point to evidence that she met with Darr on December 14, 2011 to complain that the family of a deceased coworker barred her from the coworker's funeral.   During that meeting, Spearman told Darr that she had made P.Mo., then the health service administrator, aware of "continuous violations" at the clinics that were "putting patients in danger."   Spearman Aug. 25, 2016 Dep. 16:3-7.   The Court presumes that Spearman is attempting to assert a First Amendment retaliation claim based on her December 2011 complaints to Darr.   The Court assumes a causal connection between Spearman's comments during the December 2011 meeting and Darr's February 2012 decision not to recommend her for the health service administrator position, though the causal connection is based solely on temporal proximity and is weak.

Even if Spearman made out a prima facie case of retaliation, Darr articulated a legitimate non-retaliatory reason for his decision not to overrule Corizon's choice for the position.   Corizon's choice was a registered nurse with experience working for Corizon and experience working as a director of nursing and as a health service administrator at

several other correction sites.   In addition, Darr noted that Spearman had been the subject of nepotism complaints and that she had conflicts with other employees that led a coworker's family to bar Spearman from the coworker's funeral.

Spearman did not present any evidence to rebut Darr's legitimate non-retaliatory reasons for his decision not to recommend Spearman for the health service administrator position.   "In the context of a promotion, 'a plaintiff cannot prove pretext by simply arguing or even by showing that [s]he was better qualified than the [person] who received the position [s]he coveted.'"   *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (second alteration in original) (quoting *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006)).   Rather, "a plaintiff must show that the disparities between the successful applicant's and [her] own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'"   *Id.* (quoting *Cooper v. S. Co.*, 390 F.3d 695, 732 (11th Cir. 2004), *overruled on other grounds, Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006)).

Here, Spearman did not point to evidence that she was better qualified for the health service administrator position than B.T., much less to evidence of such disparities between

Spearman's qualifications and B.T.'s that no reasonable person could have chosen B.T. over Spearman. Without some evidence of pretext, Spearman's retaliation claims based on the 2012 health service administrator decision fail.

2012 Clinic Manager Decision. Spearman next contends that she was, because of her race and due to retaliation, denied an opportunity to apply for the clinic manager position, which became open in August 2012 when R.B., the prior clinic manager, retired. Failing to point to any evidence of pretext, Spearman cannot avoid summary judgment as to these claims.

The clinic manager acted as head of human resources for the jail clinic and handled billing, accounts receivable, and payroll. The clinic manager position was not advertised or opened for applications, and no one applied for the position. When the clinic manager position became open, then-jail commander Dane Collins suggested to Darr that P.Ma., a white woman, be given the job. Collins told Darr that P.Ma. knew how to do the job because she filled in for R.B. when he was out of the office. Darr Dep. 145:19-146:3. According to Collins, the job needed to be filled quickly because "if there wasn't somebody filling in, then bills didn't get paid and people didn't get paid." Collins Dep. 67:15-17, ECF No. 45. Collins testified that P.Ma. was the "only fit for that spot that we saw at the time" because P.Ma. had filled in for R.B. when he was

"out of work for quite a bit," had experience "on the human resource side," and "had an extensive knowledge of the payroll system." *Id.* at 67:11-22.   Before P.Ma. became clinic manager, she was the human resources technician at the jail.   *Id.* at 69:22-70:1.    In   that   role,   P.Ma.   handled   payroll   for approximately 200 jail security employees.   *Id.* at 72:4-9.

Spearman asserts that she made Darr aware of her skills and of her desire to fill the clinic manager role.[8]   She also contends that she was qualified for the clinic manager position because she had been performing some of R.B.'s clinic manager duties at the prison.   Even if Spearman established a prima facie case, Darr offered a legitimate nondiscriminatory/non-retaliatory reason for offering the job to P.Ma.: P.Ma. knew how to do the job because she had been filling in as clinic manager while R.B. was out on leave, P.Ma. had experience performing human resources functions, and P.Ma. had extensive knowledge of the payroll system.   Although Spearman argues that she had been performing some of the clinic manager functions at the prison, it is undisputed that Spearman was "not familiar with the payroll system." Darr Mot. for Summ. J. Ex. O, Email from Alicia

---

[8] Before Spearman worked at the clinics, she served in the U.S. Army Reserves and served on active duty for several months.   After her military service, Spearman worked in the call center at TSYS, a large credit card processor, for a number of years until she resigned in March 2007.

Spearman to P.Ma. (Jan. 15, 2013), ECF No. 47–17.   Darr further
noted Spearman's nepotism and employee conflict issues.

Spearman presented no evidence that Darr's reasons for
choosing P.Ma. for the clinic manager position were pretext for
discrimination or retaliation.   She did not point to evidence
that she was better qualified for the clinic manager position
than P.Ma., much less to evidence of such disparities between
Spearman's qualifications and P.Ma.'s that no reasonable person
could have chosen P.Ma. over Spearman.   Because Spearman did not
present any evidence to establish pretext, Defendants are
entitled to summary judgment on this claim.

   2013 Health Service Administrator Decision.   The health
service administrator position became open again in February
2013 when Corizon fired B.T.   Spearman contends that she was,
because of her race and in retaliation for her protected
activity, denied an opportunity to apply for the position.   Darr
rehired P.Mo., a white male registered nurse who had previously
served in that position from the late 1990s through 2011.   Darr
maintains that P.Mo, who had performed the job for more than ten
years, was better qualified for the position than Spearman, a
licensed practical nurse who had not held a management position
in the clinics.

   The Court assumes for purposes of summary judgment that
Spearman established a prima facie case of race discrimination

with regard to the 2013 health service administrator decision. But she failed to produce any evidence that Darr's decision was a pretext for discrimination or retaliation.  She did not point to any evidence to establish that she was better qualified for the position than P.Mo., much less to evidence of such disparities between Spearman's qualifications and P.Mo.'s that no reasonable person could have chosen P.Mo. over Spearman. Because Spearman did not present any evidence to establish pretext, Defendants are entitled to summary judgment on Spearman's claims arising from this decision.

## V.   Hostile Work Environment Claims

As with all of their other claims, Plaintiffs failed to produce sufficient evidence to create a genuine factual dispute as to the essential elements of their hostile work environment claims.  "To establish a hostile work environment claim under the Equal Protection Clause and 42 U.S.C. § 1981, an employee (or former employee) must show harassing behavior 'sufficiently severe or pervasive to alter the conditions of [his or her] employment.'"  *Bryant*, 575 F.3d at 1296 (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 133 (2004)).  In other words, an employee must show (1) he belongs to a protected class, (2) he was subjected to unwelcome harassment, (3) the harassment was based on a protected characteristic, such as race, (4) the harassment was "sufficiently severe or pervasive to alter the

terms and conditions of employment and create a discriminatorily
abusive working environment," and (5) some basis for holding the
employer liable. *Id.* (quoting *Miller v. Kenworth of Dothan,
Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)). "In evaluating the
objective severity of the harassment," the courts consider "(1)
the frequency of the conduct; (2) the severity of the conduct;
(3) whether the conduct is physically threatening or
humiliating, or a mere offensive utterance; and (4) whether the
conduct unreasonably interferes with the employee's job
performance." *Miller*, 277 F.3d at 1276.

Defendants argue that Plaintiffs did not point to
sufficient evidence to establish that they were subjected to
harassment that was sufficiently severe or pervasive to alter
the terms and conditions of their employment. Plaintiffs'
entire response to that argument: "There is [sic] sufficient
facts in record to support Plaintiffs [sic] claims of a Hostile
Work [sic]." Pls.' Resp. to CCG's Mot. for Summ. J. 5. The
Court spent considerable time combing through the parties'
citations to the record for facts that may be relevant to a
claim for hostile work environment and set those out in Section
I, *supra*. Most of the activity was not even directed toward
Ramzy and Spearman. Moreover, it was not frequent, and it was
not severe or pervasive as those terms have been defined by the
courts in this context. Much of it could be classified as non-

34

threatening offensive utterances.   Neither Ramzy nor Spearman pointed to evidence that the conduct unreasonably interfered with their job performance.  For all of these reasons, the Court finds that Plaintiffs did not present sufficient evidence to create a genuine fact dispute on their hostile work environment claims.

CONCLUSION

For the reasons explained in this Order, the Court grants Defendants' summary judgment motions (ECF Nos. 37 & 47).

IT IS SO ORDERED, this 1st day of February, 2017.

s/Clay D. Land
_____
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA